is 518-0362 Little versus Wehrle. Are the parties ready? Yes, ma'am. Thank you, Sosko. Mr. Philbert, are you ready? Yes, ma'am. We're here today on a property line. We're here so we said given that as a matter of law, my client should win their motion for summary judgement. Because regardless of the elements of open, notorious, continuous, exclusive for 20 years, SOARTS stands for the proposition that you have to establish those by clearly convincing evidence to the exact location of the possessory line. If you can't do that, you can't win. So when we argued our motion for summary judgement, we argued that the court should find in my client's favor because the depositions that we had taken were all over the board. And I was going to get to that in our argument, but I can do it now. Can we tend to make you not go in order? No, that's okay. No, ma'am. I was telling my staff, I said I like it when Justice Case show up, get me right off the bat, and I like it. I'm always ready for that, ma'am. So again, we did the depositions in this case, and we did a lot of them. We didn't do a deposition on people that would know something. We didn't do a deposition of someone that knew where the fence was at with reasonable specificity, in my client's opinion, because he had passed away. So if you – I want to point the court to C-62, which was the amended complaint. I think this is imperative for the court to understand. And in the pleading where they're asking for the deeded owner to be divested of title and given to Mr. Little, again, they have to prove open, notorious, exclusive, continuous for a period in excess of 20 years. That's their burden by clear and convincing evidence. And when the court also, we asked to look to the sports case, which we think is almost on point, it says you have to prove those elements, including where was that line at that you possessed to, in a pretty specific manner, even if you're off by a foot or two. It says your case fails because you have to prove possession. C-62, the plaintiff pled that their possessory line was established by a fence immediately adjacent to the power poles. That's their pleading, immediately adjacent to the power poles. And they refer to an Exhibit A. If the court looks at Exhibit A, which was a survey, legal description, A and B are combined, a survey from Mr. Cox, which we didn't dispute the survey, he establishes in his survey the area between the deeded line and the power poles. And I raise the argument in our summary judgment, and I'm going to jump to this, is that the grant of relief is not even consistent with the pleading, because how can you grant, which the court ended up doing, giving a deed to the plaintiff between the power poles and the deeded line, when that's not even the allegation? The allegation is there was a fence somewhere adjacent to the power poles that established the possessory line. How did the surveyor survey the parcel that's incorporated in the deed? It is the area. The power pole. The power poles to the deeded line. And I argue that that's not even what you're claiming. How could you give the deed to that? I presume that the fence was always attached right to the power pole. You would have to assume that. And, again, that's why I would ask the court to go to the, and I've referenced them in our brief, and to the testimony that was taken, and I'll flip to that. Mrs. Little, and I'm on page 10 of our brief, Mrs. Little testified that the fence was six to eight inches east of the power poles. Mrs. Little testified that the fence was not against the power poles. That's in her deposition testimony. Jeff Little testified the fence was east of the power poles. Jeff Little said the distance between the fence and the power poles varied. It was as close as he could get. Jeff Little testified that he could not remember if the fence actually touched the power poles. Keep in mind, Jeff Little is the brother of Jay Little. Jay was the primary farmer who passed away and actually removed the fence, so Jeff was giving us his recollection the best he could. Jeff Little testified the fence was removed in 2011. There's no dispute over that. Jay Little, who passed away, removed it. Dale Conrad, this is important, was a tenant farmer on the Deal property. Deal was the predecessor and tie-up to my client. He farmed that property since 1993 and up until 1993. I apologize. And he testified that there was a fence, but he said that it was on the west side of the power poles. Not on the east side. He testified on the west side. You know, I asked Jacob Crike, who became the tenant farmer recently, on the plaintiff's trial. He couldn't remember whether the fence was attached to the poles, whether it was on the east side or the west side. Scott Wright testified that he remembered a fence and he thought it was within a foot of the east side. So that testimony did two things in my client's position. One, it certainly created an issue of fact, which rendered summary judgment improper. And in our motion for summary judgment, we argued that if that is in fact the testimony of the plaintiff's witnesses, that that is so vague and indefinite and uncertain that you can never prove what the requisite specificity is required by the Illinois Supreme Court to get a grant of a deed on the fence to the deeded line. And so the Court should just find in our favor. Again, we lost that argument, but we believe that that was the proper argument. But in a minimum, I argue to the trial court that there's an issue of fact that needs to be heard at trial as to whether or not they can establish that specificity. Even though we believe that they couldn't, my client deserved to have his day in court and not a grant of summary judgment. And again, the Swartz case that I went through. But you filed a motion for summary judgment too. Excuse me? See, now we're mixing this procedural part again. You filed a prosecution for summary judgment and now you're arguing about trial. No, I'm saying he denied my motion for summary judgment. So I filed a motion to reconsider their grant of summary judgment and argued that at a minimum if the Court should find there's an issue of fact and let me take it to trial. We argued that on the motion to reconsider. But the Court did find an issue of fact. I mean, that's what's so confusing. The Court did, and I was going to point that out. And they found in their order that there was an issue of fact but still granted summary judgment in favor of the plaintiff. Right. Paragraph 9. Yes. It says there's a genuine issue of fact. I saw that, and I argued that on the motion to reconsider. Okay. I'll ask your opponent about that. Excuse me? I'll ask your opponent about that. Exactly. But I did raise that in my argument on the motion. Again, when he granted their motion for summary judgment and denied mine, I was like, okay, as far as my client, I'm going to ask to reconsider their motion for summary judgment, saying it was improper, there's an issue of fact. I want to ask you about that, though, because I caught that, too. There's a lot of cases that says that the testimony can vary slightly, but it has to be demarcation of the property must be established with reasonable certainty. Could that encompass the fact there was some dispute, minor dispute, as to facts? I think it possibly, but, again, when the trial court said there was a genuine issue of material fact, if he felt that the issue of the property line was not sufficient enough to create a material issue, I would have thought he would have elicited that in the order he did not. So you think it wouldn't have been considered material if it was established with reasonable certainty? Again, the reasonable certainty, I would have, if the trial court would have said, we understand that the testimony, there's an issue of where the line's at, but I don't think that's material enough to cause Schwartz to be a problem, I would have disagreed with that, but I never had to make that argument because the trial court merely admitted there's a genuine issue. So I was like, okay, to me, I read that to mean that the court thought it was significant, but for some reason didn't consider that when it granted summary judgment. But, yes, if the court order would have said, ma'am, that we see this difference, but the court doesn't believe it's material, then I would have had to have addressed that differently. I believe it is material, and I'd ask this court to find that it is, because, again, we've got one witness who says it was completely on the other side of the power poles, who had farmed that ground, again, for a long time, up until 1993. So, again, we believe that the line was not established with reasonable certainty, if the court would follow the Schwartz-Piper case and find that summary judgment. Again, it could, I guess, since it's a de novo review, however you choose to rule, but at a minimum, we think that my client should have been afforded his day at trial for the trial judge to then consider whether or not that testimony was significant enough to create an uncertain property line.  So, beyond that issue, we have also the issue of continuous and exclusive possession, which I pointed out to the court. Your 20 years has to be exclusive, has to be continuous, and it has to be hostile. So the continuous and the hostile, I think, is an important thing for the court to consider. The testimony of the parties was, is that from, I believe, 1993, let me flip back. Mr. Deal, Jay, Mr. Deal, the family had rented this ground to the Little family. George and Jay were the farmers. And Mrs. Little and her other son had testified that from 1993 until about 2009, that they were the tenant farmers for the Deal family. So our position is that for that significant amount of time, there was no hostile possession of this real estate, because they were there with the permission of the landlord as a tenant. So to say that that was hostile, I believe, fails. So for the statutory period, and from 2009, I would say, then after they quit farming in 2009 is when, again, these other DeQuite brothers started farming. So, again, that would have been no hostility there. But, you know, the argument that they were hostile from 1993 to 2009, I think I would ask the court to find that didn't even exist, because you can't be a tenant on somebody's piece of real estate with permission or a written lease and say that I was in hostile possession. We provided that argument as well. So, again, for both of those reasons, we think that the grant of summary judgment was improper. What about standing? What about the issue of standing? Can you claim standing? No, I can hear. I'm sorry. I just have to lean forward. What about the issue of standing under those circumstances? They were farming pursuant to a lease. Can they adopt that lease as part of the adverse possession? You know, I understand the question. And, again, I, you know, the issue of hostility, of what compromises hostility, let's say that hypothetically up until the point of 1993 when they became the tenant that there was a fence someplace and it was hostile. If that was true, then the question becomes is once the Deal family gives them permission to take possession of their real estate, whether that hostility terminates or not. I've never seen that case, ma'am, to be honest with you.  You've been given permission to be there. But, again, I still think the question, the main question in my opinion, legal opinion, to be begged in this case is the location of the fence. We don't know where the fence was at. Was it a foot to the east? Was it a foot to the right? We know for 100 percent certainty it was not contiguous and attached to the power poles, which is what the grant of relief and the deed was to the place. I thought there was some mention that a piece of the fence was still up. That's a good question. If you go to Exhibit B that was done by Mr. Cox, the piece of property... Where is that attached to? That is attached. That was in the schedule of exhibits. It's E3, ma'am. Go ahead. Okay. If you're on E3, if you look to the very bottom of that, you'll see a little square area down there. And to the right of that, it'd be on the east side of that square, you can see where it says fence post. That's an old remnant of a fence because my client's property continues further south. So the area in dispute is only to the top of that little square area on Exhibit B. They're not arguing about the property line that runs north and south that's on the right of that little square. There was some old remnants of fence there. There was no fence way up high where you see all those utility poles on there. There's no fence left up there anymore. There's old pieces left down here in a tree line. But there was no fence... Is that where those little X's are on E3, on record E3? I see that it says fence post 11 foot west of line up at the top of that square. And then the little X's, I'm not sure, I'd have to... 11 feet west of the line. The deeded line he's talking about. How does that relate to the power pole? It doesn't because all of that property south there that you're looking at those fence posts, that was not an area of dispute. The area of dispute lied up above where you see the utility pole at the far south where it says 12 1⁄2 feet west of the line. If you drop down to that little corner right there, I guess that would be the top right corner of the square, that's where the dispute... Do you see that, ma'am? That's the end of where the disputed line stops and it goes all the way up to the top. Only that area was in dispute. Down below in that square, that was not part of the dispute. So that piece of that fence... I mean, for the fence to... If you look at this exhibit, if you have a straight fence on a piece of farm ground and this is not in dispute, then that fence as it still remains today is right along the power pole line. Well, actually, if you look... Do you see where it says 11 foot west of the line? Yes. Do you see where that... Well, it's sort of minus. Yeah. So look up above at the first utility pole where it says 12 1⁄2 feet west of the line. Yes. That power pole is... That southern power pole is a foot and a half away from that old fence. And if you go to the top, you see where the power pole is 16 foot away from the deed line? Yes. So now that power pole is 5 foot away from that fence. The power poles are moving... To the west. To the west. And we don't know where the fence was. So let's say the fence went straight north. We would be 5 foot away from the power pole. But we don't know where that fence was, but I know that... Would that be consistent with the person who farmed the youth's property that said it then ended up on the other side? I don't know... It looks like the power pole is going west, so if the fence theoretically was straight... There's 5 foot between the north part. Which is consistent with the testimony of the other gentleman. No, the other gentleman actually said that the fence was on the other side of the power pole. Yeah, so that's the essence of our argument, ma'am. But these are all factual matters that may not have been developed by the cross motions for summary judgment. Correct, that's true. They weren't. And again, I was using them at least... I filed a cross motion for summary judgment after they filed their motion to protect my client. But, you know, and my position was given the testimony and everything you're asking me about today... It's their burden to prove by clearly convincing evidence where the fence was. And as I stand here today, I don't know that they can. And that's why we were asking for summary judgment. But at a minimum, it was a question of fact. At a minimum for the trial court. And that's really all I have to say, unless there's any questions. Thank you. Do you know if a Schwartz has ever been abrogated? If it's been what? Abrogated. Not to my knowledge, no. And again, given Schwartz was a foot or two, they said even a foot or two is too much... If the court looks at that fence post of 11 foot down at the south and then... If it says that was possession and you go up, you're five foot away from that fence at the north. Was it five foot, four foot, three foot? Was it on the west side? We don't know. And so, again, at a minimum, my client's asking for a day in trial. And again, I believe that the court erred and it didn't grant summary judgment. But that's for a different day. In my client's favor. Thank you very much. Thank you very much. Yes, ma'am. Good morning, Roger. Good morning. Let me clarify. I'm sorry, Jack Johnson. And I'm hoarse. I'll do my best. First of all, let's go to the paragraph nine. Appears to be genuine issue of fact. I believe that that is simply the omission of the word no. Now, I don't think that's a specious argument. When you look at it... There was a motion to reconsider in this case, wasn't there? I'm sorry? There was a motion to reconsider in this case. Reconsider the court's order. That is correct. They filed a motion to reconsider. Well, we brought that typographical error up, didn't we? That is correct, Your Honor. But if the court will also indulge me to look at paragraph 20, where the court said, Reviewing the entire record before it in a light most favorable to the non-movement in respect to each motion, the court finds no genuine issue of material fact. You're quite right. In retrospect, that should have been corrected. But I believe if you look at it in the context of paragraphs 7, 8, 10, and 11, that it was in fact a typographical omission. But when you use language like reviewing the entire record before it in a light most favorable to the non-movement, does that phrase, do you think the court is now looking at the evidence as opposed to questions of law? It's looking at the evidence before the court in the context of the statute and the cases which have construed that which is required for adverse possession. That was exactly my question. Thank you. You put it much better than I did. Now, I want to clarify another matter. Counsel has in passing suggested that they, being the Little family, was somehow farming at some point in time for the defendant's predecessors entitled. That is not supported by the citation in their brief. George Little is the plaintiff. George Little could not testify because George Little, unfortunately, is in an Alzheimer's facility. We do have the testimony of his son, Jeff, and his wife, both of whom were actively involved in farming continuously for a period of 50-some years. And Mrs. Little was the kind of farm wife that ran the equipment, and she so testified. What do you think about this argument that we were just discussing about how the power poles vary by as much as four or five feet as they had north? All we know is that the defendants, plural, predecessors entitled, and the plaintiffs, all operated under the mistaken belief that the power poles were on the property line. No one challenged that. Defendants, predecessors entitled, never at any time attempted to exercise dominion or control over that small tract, which averaged about 13 feet. If you look at the references, it varies all the way from 9.5 to 17 feet. I think I computed the average to be about 13.5, which amounts to something in excess of three-fourths of an acre, because it was 2647 north-south. But there is no suggestion that George Little ever did anything with regard to farming or having any tenancy arrangement with the defendants, predecessors entitled. That is an erroneous statement. It's not supported by the record. It was J. Little, a son who is now deceased, who did some farming for the defendants, predecessors entitled, but there was no family arrangement. J. Little and George Little are two different people, son and father. We, of course, could not tender an exhibit showing where the fence had been, but we have a positive testimony of Mrs. Little, of Jeff Little, and one or more additional witnesses that the fence was within inches of, in parts, perhaps attached to and on the east side. The only witness that testified to the contrary was Mr. Conrad, who was now recalling back 25 years, which is the last time he'd been on the property. He remembered that there was a fence, but he said that the fence was on what would be the west side. We can only suggest to the court that this line of poles with the immediately adjacent fence has been a line of demarcation between the parties for the last 50 years, and that our client climbed up to that under the mistaken belief shared by everyone involved that the poles sat on the property line. It was only after defendants purchased the property in 2013 and then had a survey done in 14, 18 months after they acquired the property, that they asserted, purported to assert, dominion and control over the property. There's just no dispute about the plaintiff's ownership and the fact that the plaintiff's family, the plaintiff himself, his sons, his wife, and his immediately predecessors in title, all of whom were immediate family, used that property and climbed it for agricultural purposes every year up until the time that dominion was asserted in 2015. Why a fence? Why not power poles? Well, again, we talked about the fence. There's clearly the power poles were a line of demarcation. At one time, there was a fence right along it. And again, the testimony is, the only testimony is that it may have touched, it was within inches. Well, there is testimony about it being on the other side. That was by a witness who had, I'm sorry, I beg your pardon. Go ahead. No, that was by a witness who did farm many years ago and hadn't been on site for 25 years when his affidavit was taken. But the only other people that testified were those who said it was on the east side of the poles within inches. They can't tell you precisely how many inches, but I would not purport to have a surveyor try to create something because the fence isn't there anymore. The only satisfactory solution was to do it along the power poles. And here we have a tract of ground involved. It is in excess of three-fourths acres. So the legal description in Exhibit A is the power pole line? Yes, ma'am, precisely. And it corresponds with the iron pin that was found? Yes, that is correct. I believe that the criteria for adverse possession is totally met. I believe that the submitted legal description and survey is as close and accurate as we could submit to the court. We cannot submit a legal description of a fence that was immediately adjacent. That would be a misrepresentation because there's no way to do that. But I think when we're talking about linear distance of 2,600 feet, when we're talking about an attempt to determine precisely, I think that is a clear and accurate survey description. It should be acceptable to the trial court and to this court. We believe that it's accurate. We believe that it's all that could be done under the circumstances. If the fence had been there sufficient remnants, we would have used that. But it was not. This is all we could properly submit to the trial court and to this court. I have nothing else to offer unless the Court has questions. Thank you. Just briefly. Okay. I believe Mr. Johnson's argument helps bolster my clients. I wanted to point out that the survey that was done by Mr. Cox had this at 0.9 acres, and I believe Mr. Johnson was talking about three-quarters of an acre. The argument that I hear, which I think should cause it to fail, is that there was a fence somewhere. The fence was taken out in 2011, and sometime after 2011, the parties all farmed up to the power poles on the east and the west. That's what I hear. Practically, that's probably what happened. That was only eight years ago. So obviously possessing to the power poles would not meet the statutory requirements, so they're in here trying to bootstrap to that and say, well, they were farming up to the power poles since the fence came out, and that's pretty close, so give them ownership up to the power poles. We'd ask the court not to do that. I mean, again, the testimony speaks for itself. You know, counsel started off talking about how, you know, it was clear that people had been possessing, there was no dispute that they were possessing up to the, or operating up to the power poles. As far as I know from the record, after the fence was taken out, they may have farmed to the power pole on each side. I mean, it would make sense. You're not going to go farm five foot to the east of the power poles with a 20-foot field cultivator. So practically, after the fence was taken out, it may have. It doesn't deal with the issue of nobody knows where the fence was at. Again, the testimony speaks for itself. Mrs. Little says it was some inches away, and Jeff Little says that, yeah, it varied. I mean, I don't know what varied means. That's not any specificity. Let me ask you, though. The court granted the property line as being at the poles, right? Yes. And pleadings talk about the fence. And so one of your arguments is that the pleadings were never amended to grant the relief given by the trial court. Correct. I mean, the trial court's grant for relief was not even what was paid for in the complaint. That's right. But you would agree that an individual who receives a judgment like this always has the ability to amend his complaint even after the judgment is granted. Absolutely. Absolutely. Yes, I mean, I think at a minimum in this case, there was a question of fact of whether or not the location of the fence was established with enough certainty that it would have been reasonable to say that the power poles is sufficiently accurate to meet Swartz. I think after a whole trial, could that be ruled upon, and could I be in front of you arguing that that was an error? Could have been, but that's not even why we're here today, and that's why I would ask the court at a minimum to send it back and let my client have his day in court. What about the typographical error argument? What do you think about that? Well, I think that the timing, if I'm being completely frank with this court, the timing between we argued the summary judgment and the time the order was entered was so long that I think the judge who Judge Parker had great respect for probably put this order together in a rushed way. And to be honest with you, I don't know what it means, but I think it's – I don't think it's unambiguous. Was it an error on his part to say that? Well, maybe, but I don't think it could be assumed to be a typographical error. Because, again, especially on the motion to reconsider, you know, I argued there is a material issue, a significant issue, and at no time, as you said, ma'am, that was never addressed, well, maybe that was just a problem, because I pointed that out specifically. Well, you know, we see a lot of rushed orders. Yes, ma'am. This doesn't seem to be one of them. It's been a long amount of time between the two. That's the only thing I could say. But, again, I would ask the Court to say there was an issue, a fact, a significant one that at least should have been argued and vetted under, you know, examination in the courtroom for the trial court to hear. That's all. Thank you. Thank you. All right. This matter will be taken under advisement and a part of the issue in the court. Thank you.